**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Magistrate Judge Gordon P. Gallagher**

**Civil Action No. 20-cv-03569-DDD-GPG**

**RANDY DEAN QUINT,**
**JOHN LINN, and**
**MARK MOLINA, individually and on behalf of others similarly situated,**

      **Plaintiffs,**

**v.**

**VAIL RESORTS, INC.,**

      **Defendant.**

---

**RECOMMENDATION ON MOTION TO CERTIFY CLASS AND**
**ORDER ON MOTIONS TO COMPEL AND TO STRIKE**

---

This matter is before this Court pursuant to the Plaintiffs' Motion for Class Certification

(D. 149)[1] and Motion to Disseminate Notice to Collective Members and Toll The Statute of

Limitations (D. 150).  Those matters were referred to the undersigned (D. 153).  Because the

motion for class certification is a motion that 28 U.S.C. §636(b)(1)(A) prohibits this Court from

ruling on conclusively, and because the Motion To Disseminate Notice is closely-related to the

class certification motion, this Court addresses those motions in the form of a Report and

Recommendation under 28 U.S.C. §636(b)(1)(B) in Part I.

Also pending are the Defendant's (hereafter, "Vail") Motion to Strike (D. 159), and two

motions by the Plaintiffs seeking to compel discovery responses (D. 163, 164).  Each of those

---

[1]      Citations to (D. __) refer to the corresponding entry in the Court's docket.

motions has been referred to the undersigned for consideration (D. 162, 165).  These motions fall within 28 U.S.C. §636(b)(1)(A), and thus, this Court rules conclusively on them in Part II.

## FACTS

The 167-page Complaint (D. 1) is lengthy and somewhat argumentative, but its factual allegations can be stated fairly simply.  Vail operates downhill ski resorts and associated businesses at locations in more than a dozen states.  ¶ I.2, 9.[2]  Plaintiffs Randy Quint and John Linn worked for Vail as Snow Sports Instructors at Vail's Beaver Creek resort in Colorado.  ¶ II.1, 4.  Plaintiff Mark Molina worked for Vail as a Ticket Scanner at Beaver Creek resort.  The Plaintiffs allege that, due to several different Vail policies, they have not been paid for all hours they worked and have not been paid overtime premiums as required by state and federal law.  Specifically, the Plaintiffs contend that Vail: (i) fails to pay them for time they spend traveling by shuttle bus between employee parking areas and their duty stations, during which time they perform work-related duties, ¶ V.29-32, 38; (ii) fails to pay them for time spent changing into and out of work clothing (also known as "donning and doffing"), ¶ V.33, 37, 40; (iii) fails to pay them attending for pre- and post-shift meetings, completing paperwork, and otherwise performing work duties outside their scheduled shift times, ¶ V.34-36; (iv) fails to pay employees for time spent taking training courses or obtaining certifications that Vail encourages them to obtain, ¶ V.41-47; and (v) fails to reimburse employees for the costs of required work-related equipment, including ski gear, clothing, cell phones, and data plans, ¶ V.48-50.

It is not necessary to extensively describe the 22 separate claims asserted by the Plaintiffs based on these facts.  It suffices to note that Claims 1 through 4 are brought pursuant to the Fair

---

[2]     All citations in this paragraph refer to the cited paragraphs of the Complaint, found at D. 1.

Labor Standards Act ("FLSA"), 29 U.S.C. §201 *et seq.*, alleging that Vail violated that act by failing to pay employees for all hours worked, for failing to pay overtime premium pay, for failing to reimburse employees for expenses of necessary work clothing and equipment, and for failing to pay employees for time spent in training or certification programs. Claims 5 through 20 generally assert similar theories (and certain additional ones) under the wage and hour laws of the states of Colorado, California, Minnesota, Wisconsin, Washington, New York, Vermont, and Utah. Finally, Claims 21 and 22 assert common law claims (under an unspecified jurisdiction's common law) for breach of contract and unjust enrichment based on Vail's non-payment of employees for all hours worked.

## PART I – REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B) and Fed. R. Civ. P. 72(b), this Court issues the following Recommendations to the District Judge.

### A. Recommendation of Bifurcation and Stay

The Plaintiffs move (D. 149) to certify "a collective and class [action]" under both the FLSA's collective action provisions, 29 U.S.C. §216 and the class action provisions of Fed. R. Civ. P. 23(b)(3). The Plaintiffs posit that both the class and collective being defined as "All current and former [Vail] hourly employees who worked in the United States who were not compensated for work-related equipment and cell phone costs or 'off-the clock' working, including but not limited to travel time, donning and doffing time, and training time . . . ."

At the outset, this Court is compelled to note the differences between FLSA "collective actions" and Rule 23 "class actions." Claims for violation of the FLSA may be brought "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated," but the statute expressly provides that "[n]o employee shall be a party plaintiff to any

3

such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."  29 U.S.C. § 216(b).  In *Genesis Healthcare Crop. v. Symczyk,* 569 U.S. 66, 74 (2013), the Supreme Court explained that class actions under Rule 23 are "fundamentally different from collective actions under the FLSA."

More recently, in *Oldershaw v. DaVita Healthcare Corp.*, 255 F.Supp.3d 1110 (D.Colo. 2017), the court discussed in detail several of the differences between FLSA collective actions and Rule 23 class actions, including: (i) the opt-in nature of collective actions and the opt-out nature of class actions; (ii) collective actions applying individualized statute of limitations calculations to each opt-in plaintiff, whereas class actions make a single determination of timeliness that applies to all class members; (iii) the operation and significance of the "certification" process in each kind of case, with "certifications" in collective action cases being a fairly "lenient" act that occurs solely for the purpose of giving notice to potential claimants and certification in class actions being a searching and somewhat dispositive determination that controls the future of the litigation; and (iv) the fact that plaintiffs who opt into a collective action retain individual rights to litigate their own personal claims, including the ability to retain their own counsel and the ability to pursue and compromise their own claims on individualized terms, rights that are not generally available to members of a Rule 23 class.  *Oldershaw* further observed that simultaneously maintaining a collective action to resolve FLSA claims and a Rule 23 class action addressing state wage claims brought about several difficulties, including meaningfully notifying potential litigants of their varying, sometimes contradictory rights, potentially having the same litigant represented by different counsel on different claims, and complications relating to settlement.  *Id.* at 1116-18.

*Oldershaw* concluded that the best course of action for a court considering cases asserting both FLSA collective claims and Rule 23 class-based state wage claims was to bifurcate the state-law claims and stay them until the FLSA collective claims had been litigated to conclusion. Under this approach, pursuit of the FLSA collective action would proceed apace, with the Plaintiffs issuing *Hoffman-LaRoche* notices of the FLSA claims to similarly-situated employees and soliciting opt-ins.  The court would proceed to resolve the claims of all employees who affirmatively opted in.  Once those claims were fully resolved, the court would then revive the state-law claims and undertake the more complex tasks of addressing Rule 23 class certification and litigating the state-law claims.  The *Oldershaw* court recited several advantages to staged litigation, including avoiding confusing and conflicting notices to employees, expediting the issuance of notice to the collective action participants so as to minimize statute of limitations issues, and vindicating the federal interest in securing prompt enforcement of federal wage and hour statutes.  *Id.* at 1118-19.  The court concluded that no undue prejudice would result to the parties, insofar as resolution of legal and factual issues attendant to the FLSA claims could expedite future proceedings on the state-law claims and that there were no meaningful obstacles to the parties settling both sets of claims simultaneously.  *Id.*

This Court finds the reasoning of *Oldershaw* to be persuasive, both in its identification of potential points of friction between collective action and class action claims and in its conclusion that bifurcation and stay of state-law claims is an effective and non-prejudicial way to address those points of friction.  In addition to Judge Krieger, other judges in this District have endorsed the *Oldershaw* approach.  *See e.g. Nitzkorski v. Columbine Emergency Medical Services, Inc.*, 2018 WL 7141429 (D.Colo. Dec. 7, 2018) (Judge Moore adopting the bifurcation-and-stay approach).  Notably, in *German v. Holtzman Enterprises, Inc.*, 2021 WL 1092654 (D.Colo.

March 22, 2021), Chief Judge Brimmer stated that "[t]he Court finds no fault with *Oldershaw*'s analysis," but concluded that the particular circumstances of his case presented a less compelling case for bifurcation and staying of state-law claims.  He noted that "the plaintiffs in *Oldershaw* added putative class members from outside Colorado, meaning that the Rule 23 subclasses would be substantively different" than the pool of exclusively Colorado-based claimants in *German* and that only one additional statute of limitations would be at issue if the state-law claims in that case proceeded simultaneously.  Here, as discussed below, the Plaintiffs assert state-law claims arising under eight different states' laws and it may ultimately be that the court would need to certify as many as eight sub-classes to properly sort the state-law claimants according to the jurisdiction of class members' employment.  That also means eight different state statutes of limitations and eight different sets of state substantive law might require determination, all of which would substantially delay the ability of the court to quickly and conclusively adjudicate the FLSA claims of the opt-in plaintiffs.  The sprawling nature of this case serves as an additional factor favoring the bifurcation-and-stay approach to the state law claims.

Accordingly, this Court recommends that the District Judge follow *Oldershaw*, bifurcating the state law claims (Claims 5 through 22) from the FLSA claims (Claims 1 though 4) and staying all proceedings relating to the former until the latter are conclusively resolved as to all opt-in Plaintiffs.

### B.  Motion for Class Certification

In the alternative, if the Court wishes to consider the Plaintiffs' Motion for Class Certification, this Court recommends that that motion be denied as currently presented.

Fed. R. Civ. P. 23(a) provides that a class may be certified only if: (i) the class is so numerous that joinder of all members is impracticable ("numerosity"); (ii) there are questions of

law or fact common to the class ("commonality"); (iii) the claims of the representative parties are typical of the claims of the class ("typicality"); and (iv) that the representative parties will fairly and adequately protect the interests of the class.  In addition, in cases like this one where certification is sought pursuant to Fed. R. Civ. P. 23(b)(3), the movant seeking certification must also show that the common questions of law and fact predominate over any questions affecting only individual members ("predominance").

Before turning to analyze these issues, this Court pauses to make several observations. First, the Court conducts its analysis based on the class definition proposed by the Plaintiffs, namely "[a]ll current and former Vail [ ] hourly employees who worked in the United States and who were not compensated for work-related equipment and cell phone costs or off-the-clock work including, but not limited to, travel time, donning and doffing time, and training time." Second, the Court notes that the Complaint and the Plaintiffs' proposed class definition focus on four major areas in which the Plaintiffs contend that Vail has violated state and federal wage and hour laws: (i) not compensating employees for "travel time" spent riding Vail-provided shuttles from remote employee parking lots to the base area where employees clock in for work; (ii) not compensating employees for time spent donning and doffing necessary work equipment and uniforms; (iii) not compensating employees for time spent taking training and certification courses required or encouraged by Vail; and (iv) not compensating employees for the cost of work-related equipment (including cell phones and data plans) that Vail requires them to obtain and use as part of their work.  The Court's consideration of the class certification motion will therefore address these four categories of claims.  Third, the Court notes that the Rule 23 class certification analysis is germane only as to the Plaintiffs' claims arising under various state wage and hour laws.  As discussed above, the Plaintiffs' FLSA claims are governed by that statute's

own unique collective action mechanism.  Thus, the only claims germane to the class

certification inquiry are Claims 5 through 22, arising variously under state laws in Colorado,

California, Utah, Vermont, New York, Washington, Minnesota, and Wisconsin.

With those constraints in place, the Court turns to the question of whether the Plaintiffs

have adequately demonstrated the presence of the necessary Rule 23(a) and (b) factors.  The

Court will devote most of its discussion to the commonality and predominance requirements,

which are somewhat intertwined.  To satisfy the "commonality" requirement, the Plaintiffs must

show class members' claims "depend upon a common contention of such nature that it is capable

of classwide resolution" – that is, that its "truth or falsity will resolve an issue that is central to

the validity of each one of the claims in one stroke."  *Menocal v. GEO Group, Inc.*, 882 F.3d

905, 914 (10th Cir. 2018).  A finding of commonality may be made on the basis of only a single

question of law or fact that is common to the entire class (subject, of course, to the predominance

requirement). *Id.*  The "predominance" element is "more demanding than" the commonality

question.  It asks "whether the common, aggregation-enabling issues in the case are more

prevalent or important than the non-common, aggregation-defeating, individual issues," and

requires the court to "characterize the issues in the case as common or not, and then weigh which

issues predominate."  *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th

Cir. 2019).  The Court does so by "considering how the class intends to answer factual and legal

questions [ ] and the extent to which the evidence needed to do so is common or individual."

*Menocal*, 882 F.3d at 915.  The Court is also mindful that class certification decisions are

"necessarily case-specific [and] district courts possess significant latitude in deciding whether or

not to certify a class."  *In re Samsung Top-Load Washing Machine Marketing Litigation*, 997

F.3d 1077, 1086-87 (10th Cir. 2021).

There are at least two dimensions to the Plaintiffs' claims that make the commonality and predominance issues especially difficult to satisfy.  First, there is what this Court will describe as the *vertical* diversity of the proposed class.  The Plaintiffs' proposed class definition encompasses <u>every</u> hourly employee employed by Vail at a given resort ("All current and former Vail [ ] hourly employees..."), including, presumably, parking attendants, ticket sales staff, equipment rental personnel, maintenance and cleaning staff, lift attendants, ski patrol, snow sports instructors, food service staff, bartenders, security, customer service staff, shuttle drivers, and a potentially broad array of unspecified others.[3]  There is an extremely wide variety in the tasks performed by each type of employee and a concomitantly wide variety of ways in which commonly-applied Vail policies might affect each type of employee.

For example, it would not be remarkable to conclude that ski instructors or ski patrol staffers are required to frequently take training programs in subjects such as first aid or to maintain periodic certifications in teaching or other disciplines.  Whether Vail is required to compensate employees for such training time is a question that might be common and predominant in a class comprised only of ski instructors and ski patrol staff.   But it seems unlikely that, say, parking lot attendants or food service staff are required to undergo the same types of mandatory periodic training and certification, and thus, the question of compensability of training time is largely (if not entirely) irrelevant to those employees.  Similarly, the amount of time that ski instructors or ski patrol staff spend changing into and out of ski equipment

---

[3]      The Court makes clear that this list of titles is hypothetical and merely illustrative of the types of jobs that <u>might</u> be staffed by hourly Vail employees at a given location.  The reasoning in this Recommendation does not turn on the existence of any particular job title and if, for example, food service is entirely subcontracted at all Vail locations, that fact does not alter the Court's analysis.

(windproof/waterproof gear, ski boots, helmets, etc.) in order to do their jobs may be considerable, but the amount of time that, say, indoor-working customer service staff or ticket sales staff spend donning and doffing equipment (which might be little as putting on or taking off a uniform shirt or jacket) is likely to be much less, possibly even negligible.  Employees who work outdoors, but in ordinary cold-weather clothing – lift attendants, parking attendants, etc. – may fall somewhere in between.  The facts that may bear on whether Vail is obligated to pay employees for donning and doffing time are likely to vary considerably based on the amount and type of clothing and equipment each type of employee uses in the course of their employment.  These differences suggest that the commonality and predominance factors are adversely affected by the broad vertical diversity in the varying job titles that are swept up by the Plaintiffs' proposed class definition.

Likewise, the nature and quantity of equipment that a given employee is required by Vail to procure – equipment that the Plaintiffs contend Vail is obligated to reimburse them for -- is also likely to vary greatly between skiing and non-skiing employees.  Undoubtedly, job titles that require employees to actually ski (ski instructor, ski patrol) may have particular equipment-related requirements involving specialized ski clothing and gear, but those same requirements are not necessarily present for non-skiing job classifications like ticket sales, bartending, or shuttle driving.  The Complaint appears to focus particularly on the alleged fact that Vail requires employees to have cell phones and data plans in order to perform their work. The precise contours of this claim are somewhat unclear.  To be sure, there is ample evidence in the record that Snow Sports Instructors make extensive work-related use of cell phones as part of their job duties, such as by contacting students before lessons, arranging meeting places, and checking on snow and trail conditions during the day.  The class certification motion is supported by

affidavits from 17 Vail employees, 16 of whom are Snow Sports Instructors, many of whom attest to their use of their cell phones in the course of their employment.  But the record is silent as to how, or even if, Vail requires non-Snow Sports Instructor employees to use a cell phone in the course of their duties.  The only non-instructor providing an affidavit in support of the class certification motion is Plaintiff Mark Molina, who worked as a Ticket Scanner.  D. 149-6.  Mr. Molina's affidavit makes no mention whatsoever of Vail requiring him to possess a cell phone, nor does it describe how Mr. Molina was required by Vail to use that cell phone as part of his routine work duties.  Accordingly, the Court cannot necessarily assume that all members of the proposed class – every single hourly employee at Vail ski resorts -- have common, much less predominant, claims relating to non-reimbursement of equipment costs.

The only claim that even potentially appears to be genuinely common to all employees, regardless of job title, concerns the compensability of travel time from remote employee parking lots to the employees' regular work station(s) at the resort.  The Plaintiffs assert that all Vail resorts require employees to leave parking spaces closest to the base areas open for customer use, and the Court will assume (without necessarily finding) that many, or even most, employees commute to a Vail resort, park in employee lots, and ride Vail-provided shuttles to reach their actual work stations.  But the mere fact that employees typically commute from remote parking areas to the worksite does not necessarily render that time compensable.  *See e.g. Del Rosario v. Labor Ready Southeast, Inc.*, 124 F.Supp.3d 1300, 1309-10 (S.D.Fl. 2015) (under FLSA, "[t]he commute between the employee parking lot and Alamo MIA fits squarely within the preliminary and postliminary activities exception found in 29 U.S.C. § 254(a), as interpreted by the DOL, 29

C.F.R. § 790.7(f)").[4]  Rather, the compensability of travel time may often turn on facts such as what activities employees may or may not engage in during that travel.  *See e.g. Anderson v. State Dept. of Social and Health Services,* 63 P.3d 452, 456 (Wa.App. 2003) (time spent on employer-provided ferry service to island where workplace was located was not compensable under Washington law because it employees could engage in personal activities and were not "on duty" during ride).  Both the Complaint and affidavits supporting the motion for class certification contend that <u>Snow Sports Instructors</u> commonly engage in work-related tasks while riding shuttles to and from employee parking.  *See e.g.* D. 1, ¶ 31, 32.  It is less clear whether, or even if, other types of hourly employees, such as food service workers or parking attendants, similarly engaged in work-related activities while riding shuttles.[5]  Thus, even the travel time claim presents substantial individualized questions of fact and law, depending on the differing job titles and duties of the various class members.  The Court finds that these individualized issues predominate over any common issues.

The same is true of what this Court will refer to as the *horizontal* diversity of the proposed class.  The Plaintiffs propose a class consisting of hourly employees at every Vail

---

[4]      As mentioned above, the Rule 23 inquiry focuses solely on the Plaintiffs' state-law claims, not their FLSA claims.  The Court offers *Del Rosario*'s analysis of the compensability of travel time under the FLSA merely to illustrate that the analysis of such claims is far from straightforward.  Although some state laws might directly address the compensability of this type of travel time, it is fair to assume that many other states may, silently or expressly, follow the approach of the FLSA on the question.

[5]      Once again, the Court considers Mr. Molina's affidavit, the only description in the record of tasks being performed by a non-Snow Sports Instructor.  Mr. Molina offers the conclusory statement that "[w]hile I was waiting for and riding the employee shuttle, I was under the control of [Vail] and could not use this time for my own purposes," but does not elaborate on the facts that led him to that conclusion.  Mr. Molina does not describe any specific work-related tasks he routinely engaged in while waiting for or riding shuttle buses.

location in the United States – a class which may comprise as many as 32 locations in twelve or more states.  *See* D. 1 at ¶ 20.  The Complaint expressly asserts state law claims arising under eight different states' laws.  Thus, to satisfy the commonality and predominance elements, the Plaintiffs must show that those eight states' wage and hour laws all have essentially the same substantive requirements or, at the very least, that all eight states examine substantially the same factors in deciding whether an employee's time is compensable or not.  Put another way, if, for example, California state law looks at different factors than Washington state does in applying their wage and hour laws as they relate to the compensability of employee travel time, certification of a single class to litigate claims under both statutes would not satisfy the commonality and predominance test, as the court would be required to examine different facts for class members from California than it does for class members from Washington.[6]  *See Curson v. Jackson National Life Ins. Co.*, 954 F.3d 240, 254-55 (5th Cir. 2020) ("In a class action governed by the laws of multiple states, variations in state law may swamp any common issues and defeat predominance. The party seeking certification of a nationwide class must therefore provide an extensive analysis of state law variations to reveal whether these pose insuperable obstacles").   The Plaintiffs have not argued that the eight states in question have effectively similar laws, and indeed, there is reason to believe that they consider substantially different factors when assessing the same question.  *Compare e.g. Anderson, supra.* (under Washington

---

[6]     This Court does not understand the Plaintiffs to contend that an employee at a Vail resort in, say, Utah, could recover on claims under New York State's state laws.  It is reasonable to assume that each class member would be limited to asserting state law claims only under their own state's wage and hour statutes.  *But see* D. 144 (finding, as a matter of standing, that a duly-designated class representative can assert claims under other states' laws on behalf of class members of that state).

law, compensability of travel time turns on whether employees were "on duty" during ride) *with Overton v. Walt Disney Co.*, 136 Cal.App.4[th] 263, 271 (Cal.App. 2006) (travel time to work site from employee parking is not compensable under California law unless the employer <u>required</u> employees to use the employer-provided transportation and prohibited all other alternatives such as taking public transportation or drop-offs).  Thus, the horizontal geographic diversity of the class members, and thus, the diversity of the governing substantive law, prevents a finding that the single class proposed by the Plaintiffs entail common questions of law that predominate over more individualized determinations.[7]

Accordingly, this Court concludes that the Plaintiffs have not demonstrated that common legal or factual issues would predominate in an action brought by a single, nationwide class as proposed by the Plaintiffs.[8]  Because the Plaintiffs have not satisfied the requirements of Rule 23, this Court recommends that the Motion for Class Certification (D. 149) be DENIED.

### C.  Approval of *Hoffmann-LaRoche* Notice

As previously referenced, the FLSA has its own collective action scheme, by which employees must "opt-in" to the litigation in order to be allowed to assert their own individual FLSA claims.  In *Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165 (1989), the Supreme Court granted courts the discretion to oversee the process by which collective action plaintiffs give

---

[7]      For similar reasons, this Court would also conclude that the named Plaintiffs – two Snow Sports Instructors and one Ticket Scanner, all of whom work only in Colorado – are not adequate class representatives to assert claims on behalf of employees in other job classifications and under other states' laws.  Fed. R. Civ. P. 23(a)(4).

[8]      It may be that a proposed class that is narrower horizontally and/or vertically might satisfy Rule 23 (*e.g.* a class comprised solely of Vail's Snow Sports Instructors in Colorado). But the Plaintiffs have not argued for the possible certification of a smaller class in the alternative and this Court will not attempt to fashion the Plaintiffs' arguments for them.

notice of the litigation to their similarly-situated co-workers, allowing the co-workers the opportunity to then opt into the existing litigation. Court supervision of the process of notifying affected employees and soliciting opt-in notices can ensure that information received by employees about the suit is "timely, accurate, and informative," can prevent "a multiplicity of duplicative suits," and can set deadlines for the submission of opt-in notices so as to "expedite disposition of the action." *Id.* at 172.

The question of <u>who</u> should receive a *Hoffmann-LaRoche* notice is often the subject of some dispute, with plaintiffs' attorneys seeking dissemination of notice to a broad array of employees and employers' attorneys arguing for a narrow scope of notice. The touchstone of that inquiry is the FLSA's collective action provision, which allows "other employees similarly situated" to a named plaintiff to opt in to the named plaintiff's existing suit. 29 U.S.C. §216(b). In *Thiessen v. General Electric Corp.*, 267 F.3d 1095, 1102-03 (10th Cir. 2011), the 10th Circuit discussed three different types of approaches that courts used to assess the "similarly situated" inquiry, including affirming the trial court's use of a two-stage "ad hoc" approach that involved a "fairly lenient" initial determination of similarity for *Hoffmann-LaRoche* notice purposes, followed by a "stricter" review of similarity after opt-in notices had been returned and discovery conducted regarding the particular opt-in plaintiffs. *Thiessen* did not particularly describe the "lenient" analysis the court should undertake at the initial notice stage, other than noting other cases that "require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."[9] *Id.* at 1102. In *Turner v.*

---

[9]      At the "stricter" stage, the trial court considered "several factors, including: (i) whether a sufficient link existed between the alleged employment policy and the challenged employment decisions; (ii) whether individual issues would predominate at trial; and (iii) whether a trial of

*Chipotle Mexican Grill, Inc.*, 123 F.Supp.3d 1300, 1309 (D.Colo. 2015), Judge Kane concluded that the court should "presumptively allow workers bringing the same statutory claim against the same employer to join as a collective," deferring questions of substantial similarity to a later date just as *Thiessen* did.  Thus, *Turner* approved of issuance of a *Hoffman-LaRoche* notice to "all current and former non-exempt hourly workers employed by Chipotle" where the allegation was that managers routinely required employees to engage in off-the-clock work.  *Id.* at 1301-02, 1309.

Although cases like *Thiessen* and *Turner* posit lenient standards governing similarity for purposes of authorizing *Hoffmann-LaRoche* notices, that lenience does not amount to a rubber stamping of the plaintiffs' theory of the case.  There must be some *prima facie* indication that the FLSA violations the plaintiff complains of are indeed occurring at the degree and scale the plaintiff alleges, lest an individualized pay grievance metastasize to a nationwide litigation based only on the strength of the plaintiff's say-so.  As *Thiessen* hints, the standards of Rule 23 certification are probably too exacting to apply at the *Hoffmann-LaRoche* notice stage, but there can be little argument that the now-familiar "plausibility" standards of Fed. R. Civ. P. 12(b)(6), as articulated in *Ashcroft v. Iqbal*, 556 U.S. 662, 677-84 (2009), are a fair burden to measure the plaintiff's claims against.  After all, it makes little sense to suggest that a plaintiff must plead plausible facts to <u>commence</u> an action, but that the plaintiff need not even do that in order to thereafter spread word of that litigation to others and invite them to join in.

Thus, this Court finds that the scope of the *Hoffmann-LaRoche* notice must be limited to those similarly-situated individuals whose potential FLSA injuries are plausibly alleged in the

---

the action could be coherently managed in a way that would not unduly confuse a jury.  267 F.3d at 1103.

Complaint or in other evidence in the record.  To make that determination, the Court examines

the record, discarding allegations that are "mere labels and conclusions" and "formulaic

recitation of the elements of a cause of action," instead looking for "sufficient factual matter

[that,] accepted as true, . . . allows the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged."  *Bledsoe v. Carreno,* ___ F.4th ___, 2022 WL 16942631

(10th Cir. Nov. 15, 2022), *citing Iqbal*.  As discussed, above, there is ample evidence to support

the conclusion that Vail's wage and hour policies violate the FLSA rights of Snow Sports

Instructors nationwide.  The record contains affidavits from Snow Sports Instructors at Vail

resorts in several states, describing the same wage and hour policies applicable to them and sets

forth facts that, if credited, plausibly demonstrate that those policies violate the FLSA in the four

respects alleged by the Complaint.  Nothing in the record disputes the Plaintiffs' allegations that

those policies apply at all Vail resorts across the country.  Thus, the Court finds it appropriate to

authorize issuance of a *Hoffmann-LaRoche* notice to all Snow Sports Instructors employed by

Vail during the relevant period.

But for many of the same reasons discussed with regard to "vertical" problems with Rule

23 certification, this Court finds that the record does not contain assertions of fact that plausibly

suggest that all other hourly employees at Vail resorts have suffered similar FLSA violations.[10]

The contention that parking attendants, ticket sellers, food service workers, and various other

categories of hourly employees have suffered the same injuries as Snow Sports Instructors is

---

[10]     This Court previously considered a request by the Plaintiffs to authorize notice to "[a]ll
current and former[Vail] hourly employees" and denied that request as overly broad and
insufficiently supported by well-pled facts.  D. 114.  That recommendation was adopted by the
District Judge.  D. 141.  Except as discussed herein, the arguments and factual showing in the
current motion are not materially different from the arguments and facts previously proffered by
the Plaintiffs.

entirely conclusory.  With the one exception discussed below, the Complaint contains no allegations whatsoever by or about these categories of employees and the Plaintiffs have not tendered any affidavits by any of these employees explaining how Vail's policies have injured these employees under the FLSA.  Even as to travel time, cases like *Del Rosario* make clear that the Plaintiffs must allege more than just "we traveled on employer-provided transportation from remote employee parking lots" in order to render that time compensable under the FLSA.  The record contains evidence that Snow Sports Instructors engaged in work benefitting Vail while riding employee shuttles, potentially converting that non-compensable time into compensable time, but there is nothing in the record that plausibly suggests that other categories of hourly workers regularly performed similar work while traveling to and from parking lots.  Thus, the Court cannot conclude that the Complaint or the record asserts plausible FLSA claims by non-Snow Sports Instructors.  As a result, issuance of a *Hoffmann-LaRoche* notice to these employees is not appropriate on the current record.

The one exception concerns Mr. Molina, a Ticket Scanner.  He is the only instance in the record in which a non-ski instructor describes his work and how Vail's wage and hour policies violate his FLSA rights.  As discussed above, this Court finds that Mr. Molina's allegations regarding being "under the control" of Vail while riding shuttles, thus rendering his travel time compensable, to be insufficiently conclusory to state a plausible FLSA claim for uncompensated travel time on the current record.  Nor does the Complaint or Mr. Molina's affidavit give any hint of actual facts that would support his FLSA claims for unpaid training time or reimbursement for work-related equipment.  That leaves only the question of whether Mr. Molina's allegations regrading donning and doffing time would suffice to warrant broadening the *Hoffmann-LaRoche* notice beyond just Snow Sports Instructors.

To repeat, Mr. Molina worked as a Ticket Scanner, checking guests ski passes as they boarded ski lifts.  Mr. Molina's affidavit explains that, pursuant to Vail policy, he clocks in for his shift upon exiting the employee locker room for his work site, and clocks out of his shift upon entering the employee locker room at the end of the day to change into his street clothes. D. 149-6, ¶ 5-7, 9.  Thus, time Mr. Molina spent changing into and out of his work clothing and equipment was not treated as compensable time by Vail.  Mr. Molina explained that "depending on how crowded the locker was," the process of changing into his work gear could take "about 10-15 minutes" each day.  *Id.*, ¶ 5.  At the end of the day, Mr. Molina would change out of his equipment and, if the equipment was wet, would "have to hang by garments in a way that they would have a chance to dry by morning or take them home to dry them."  Mr. Molina estimated that, "[d]epending on the weather and number of employees in the locker, it would take me 10-20 minutes to change and store my equipment."  *Id.*, ¶ 7.  Mr. Molina's affidavit does not specifically describe the particular clothing and gear he donned and doffed each day other than to describe it as his "boots and uniform."  *Id.*  Without a more detailed description, the Court will assume that Mr. Molina's "uniform" consists of a Vail-branded cold-weather jacket,[11] snow pants or other wind- and waterproof pants (which may or may not have Vail branding), cold-weather boots, and such gloves, hats, and other apparel as would be commonly worn by those working outside in winter temperatures.

---

[11]     Mr. Molina and others attested to the need to change out of their "uniform" – presumably any clothing that had Vail branding – immediately at the end of their shift because Vail policies provide that "if you are in uniform, you are not 'off the clock' because guests could be asking me for help" and because Vail restricted the activities (such as alcohol consumption) that off-duty employees could engage in while still in uniform.  *Id.*, ¶ 11.

The Court need not recite the torturous history of the FLSA as it relates to donning and doffing time; interested readers may refer to *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 225-227 (2014), for some background on that issue.  Presently, the FLSA requires compensation for tasks undertaken before or after a shift that are nevertheless "an integral and indispensable part of the principal activities."  *Perez v. City of New York*, 832 F.3d 120, 123 (2d Cir. 2016).  On the other hand, the FLSA excludes coverage for activities that are "preliminary to or postliminary to" an employee's principal activities.  29 U.S.C. §254(a)(2).  In *Perez*, the court considered the question of whether the donning and doffing of park ranger uniforms and related law-enforcement equipment was "integral and indispensable" to performing work as a park ranger or whether it was merely "preliminary to" that job.  *Perez* identified certain factors that helped illuminate the issue: (i) the assumption that "the more the activity is undertaken for the employer's benefit" and "the less choice the employee has in the matter," the more likely the work is indispensable and is being performed for the employer's benefit; and (ii) the employer's requirement that the activity take place at the workplace may indicate that the activities are integral to an employee's duties.  *Id.* at 124.  *Perez* also considered prior decisions addressing the compensability of time spent donning and doffing protective gear and related measures, ultimately concluding that "an employee's efforts to protect against workplace dangers that transcend ordinary risks" – such as those associated with lead poisoning from battery manufacture or butchering work in a slaughterhouse – could be indispensable to the job and therefore compensable time, but that employees donning and doffing "generic helmets, safety glasses, and steel-toed boots" to protect against the sorts of hazards typical in an industrial workspace was not compensable.  *Id.* at 124-25, *citing, inter alia, Steiner v. Mitchell*, 350 U.S. 247 (1956) *and Gorman v. Consolidated Edison Corp*, 488 F.3d 586, 594 (2d Cir. 2007).

With these principles in mind, this Court concludes that the Plaintiffs have not adequately alleged facts that would suggest that donning and doffing time for Ticket Scanners like Mr. Molina (and by extension, other on-snow workers like ski lift attendants) is compensable under the FLSA.  If one equates the cold-weather gear that Mr. Molina dons and doffs to protective gear, it is clear that the hazards he faces are the ordinary hazards of cold-weather exposure that any wintertime outdoor worker (or winter sports participant) faces, and the gear he dons for protection is "generic" safety gear commonly used by ordinary people to address those risks, not specialized gear that it is impossible to perform the task of ticket scanning without.  *Gorman*, 488 F.3d at 594, *citing Reich v. IBP, Inc.*, 38 F.3d 1123, 1126 (10th Cir. 1994) ("although essential to the job, and required by the employer, any time spent on [donning and doffing safety glasses, earplugs, a hard hat, and safety shoes or boots] is not work").  It is clear that Mr. Molina is not required by Vail to change into the clothing and gear in the employee locker room, as Mr. Molina's affidavit indicates that he may, at his option, bring his uniform clothing and gear home to dry it out (compared to, for example, the battery workers in *Steiner* who were required to shower and change gear immediately upon ending their shift to avoid prolonged lead exposure). It may certainly be <u>preferable</u> for Mr. Molina to delay donning his uniform jacket (and any other Vail-branded apparel) until he arrives at the employee locker room to avoid conflicts with Vail's restrictions on uniformed employees' conduct, but that mere preference does not suffice to render otherwise non-compensable donning and doffing time to be "integral and indispensable" to his work as a Ticket Scanner.

Accordingly, this Court believes that the Plaintiffs have not yet demonstrated a colorable claim that Vail's refusal to pay for donning and doffing time for non-Snow Sports Instructors violates the FLSA.  As a result, the Court finds that it is not appropriate to direct the issuance of

a *Hoffmann-LaRoche* notice to any non-Ski Instructor employees on any of the claims in this case.  It may be that, at some point in time, the Plaintiffs supplement the record with additional allegations that warrant revisiting that determination, but on the present record, this Court finds that a *Hoffmann-LaRoche* notice is warranted only as to Snow Sports Instructors employed nationwide by Vail.

Finally, the Court addresses an issue that potentially narrows the scope of notice even to Snow Sports Instructors.  It is undisputed that a previous lawsuit against Vail for FLSA violations has been brought and resolved in the State of California.  D. 158.  In that lawsuit, referred to as the *Hamilton* case, the court approved a settlement class composed of "all non-[FLSA] exempt employees who, during the Covered Period, worked for and were employed by Vail in the United States and worked primarily at one of its resort locations or mountain facilities."  *Id.* at 3.  The *Hamilton* court approved a settlement that included FLSA claims, although the record before this Court does not clearly identify what those claims were.  Here, Vail contends that the settlement of the *Hamilton* case operates as *res judicata* (or perhaps voluntary release) to bar FLSA claims here from any members of the *Hamilton* settlement class, leaving only the 1,603 individuals that expressly opted out of the *Hamilton* settlement that could conceivably opt <u>into</u> this litigation as FLSA plaintiffs.  Thus, Vail argues, any *Hoffmann-LaRoche* notice this Court approves should be directed only to those 1,603 individuals.

The Court rejects Vail's argument.  By its terms, the settlement of the *Hamilton* case is not effective until all appeals to the order approving that settlement are resolved, and the Plaintiffs assert that they have filed an appeal of that order.  It may very well be that the *Hamilton* settlement is ultimately affirmed and any plaintiffs who opt into this case in the interim without having timely opted out of the *Hamilton* settlement may have their claims in this case

dismissed on *res judicata* grounds, but that is a matter for another day.  The Court also rejects Vail's argument that issuing a *Hoffmann-LaRoche* notice in this case may be confusing to employees who are also receiving notice in the *Hamilton* case.  Although the Court can appreciate the possibility of confusion arising from laypeople receiving multiple legal notices on closely-related cases, that potential confusion is an unavoidable consequence of independent lawsuits running in parallel.  As between employees receiving a confusing notice in this case (an outcome this Court will endeavor to avoid) or receiving no notice whatsoever of a case they are otherwise eligible to participate in, justice favors the former even with its attendant flaws.

The Plaintiffs propose – and Vail opposes – that the *Hoffmann-LaRoche* notice be sent to eligible recipients both by mail as well as by e-mail, text message, and by a posting on Vail's intranet.  Although the Court appreciates that the goal of notice is to ensure that the maximum number of eligible employees receive notice, the risk of annoying recipients into indifference through over-saturation is just as substantial as the risk of missing recipients through under-dissemination.  The Court agrees, to some extent, that Vail's workforce is "transitory" and that regular mailing does not necessarily ensure that eligible Snow Sports Instructors will adequately receive notice.  Accordingly, the Court authorizes the *Hoffmann-LaRoche* notice to be to the last known postal mail address and to the last known e-mail address of eligible Instructors.  The Court finds that additional service of notice by text message, telephone, or on Vail's intranet is unnecessary and rejects that portion of the Plaintiffs' request.

Vail also takes issue with the content of the notice proposed by the Plaintiffs.  This Court finds that most of the edits proposed in Vail's redlined version of the notice, D. 161-1, are appropriate and recommends that the notice be modified in those respects.

Accordingly, this Court recommends that the Plaintiffs' Motion to Disseminate Notice (D. 150) be GRANTED IN PART and DENIED IN PART as set forth above.

## PART II – OPINION AND ORDER

Pursuant to 28 U.S.C. §636(b)(1)(A) and Fed. R. Civ. P. 72(a), the Court enters the following rulings on the non-dispositive matters that have been referred to it for determination.

### D.  Motion to Strike

Vail moves to strike (D. 159) certain portions of certain affidavits tendered by the Plaintiffs in support of their motion for class certification, alleging that the affidavits have various evidentiary deficiencies such as proffering hearsay and relying on speculation rather than the affiant's personal knowledge.  The Court DENIES the motion as moot.  In issuing its Recommendation, the Court has considered only those aspects of the affidavits that are pertinent and admissible.

### E.  Motion to Compel Production of Documents[12]

The scope of initial discovery was set by the Court's Scheduling Order of July 8, 2021. D. 64.  That Order set forth a plan for phased discovery and we are currently in Phase 1 of that plan.  Phase 1 discovery "will focus on the Named Plaintiffs and opt-in plaintiffs and the discovery necessary for conditional certification of the FLSA collective action."  *Id.*

The Plaintiffs move to compel Vail to produce certain documents that the Plaintiffs have requested.  D. 163.  Rather than engage with that lengthy motion in all its particulars, the Court

---

[12]  In the interests of expediting this already-delayed case, the Court will overlook what appears to be the Plaintiffs' failure to raise these discovery issues through the informal discovery dispute process set forth in the undersigned's Practice Standards.  The parties are advised that future motions to compel that are filed before completion of the informal process and without the prior authorization of the Court will be summarily denied.

will focus on the broader themes embodied within it.  Generally speaking, the Plaintiffs request four major categories of documents that, they contend, Vail has refused to produce: (i) policy manuals and statements in effect at Vail locations other than those where the named Plaintiffs worked (that is, Beaver Creek resort in Colorado); (ii) "pay advice" reports and "pay statements or paycheck stubs" "in native electronic format" for the named and opt-in Plaintiffs; (iii) Vail's organization charts; and (iv) evidence of public statements (that is, "emails, memos, drafts, and PowerPoint slides") that Vail made concerning its pay policies or wages.

The Court quickly dispenses with the fourth category of requests.  Documents relating to Vail's public statements concerning its wages are not encompassed by the Phase 1 definition, which focuses only on identifiable Plaintiffs (named or opt-in) and putative FLSA claims. Public statements about Vail's wages are relevant, if at all, only to the Plaintiffs' common-law fraud claims or their state-law analogues.  None of the Plaintiffs' (named or opt-in) FLSA claims will turn on whether or not Vail paid the type of wages they referred to in generalized and categorical statements to the public (rather than to the specific wages Vail promised to pay individual employees at the time of their hire).  Thus, the Court denies the motion as to the request for documents relating to public statements.

As to the remaining three categories of requests, Vail offers two major objections: (i) it should not be required to produce information relating to the opt-in plaintiffs whose consent forms were stricken by the Court, and (ii) it should not be obligated to produce information for locations other than those where existing plaintiffs (in other words, currently only the named Plaintiffs) worked.

To address the first argument, the Court notes that between November 2021 and May 2022, some 18 former employees filed consent forms, opting in as additional FLSA plaintiffs.  In

a February 21, 2022 Recommendation, this Court recommended that those consent forms be stricken without prejudice because the Plaintiffs had not shown that the opt-in plaintiffs were similarly-situated to the named Plaintiffs for purposes of 29 U.S.C. §216(b).  D. 114 at 8.  The District Judge agreed that striking those consent forms was "correct" and adopted the Recommendation.  D. 141 at 7-9.  The striking of the consents operated to exclude those opt-in parties from this litigation, leaving only the named Plaintiffs as parties.  Thus, to the extent Vail cabined its responses to the Plaintiffs' request for production based on the identity of persons as "plaintiffs" or not, it properly limited its responses to only the named Plaintiffs.[13]

The remaining question is whether Vail is obligated to produce policy statements and organizational charts for locations other than the named Plaintiffs' Beaver Creek location under the theory that those documents are "necessary for conditional certification of the FLSA collective action."  Regardless of what the answer to that question may have been in the past, the analysis has changed now that this Court has approved the issuance of *Hoffman-LaRoche* notice to all Snow Sports Instructors nationwide.[14]  At this point, there is no longer a need for discovery focusing on the need for conditional certification of a collective of Snow Sports Instructors, and Vail will be required to produce policies and organizational charts for the locations at which any

---

[13]     Which is not to say that this Court encourages narrow and technical approaches to discovery.  Although the employees submitting consent forms are not yet part of the litigation, it is not difficult to anticipate that at least some of them eventually will be (and indeed, those who are Snow Sports Instructors may now be ready to (re)join this action by operation of this ruling).  Delaying the production of discovery that is not yet ripe but almost certainly will be eventually may be technically permissible, but it is not especially consistent with the goals of Fed. R. Civ. P. 1.  The Court encourages the parties to view discovery as a collaborative, rather than competitive, process.

[14]     To use the somewhat misleading parlance of cases like *Thiessen*, this Court has now "conditionally certified" a potential collective action of Snow Sports Instructors.

opt-in plaintiffs worked as those opt-in plaintiffs file consent forms.  To the extent the Plaintiffs

believe that they should be entitled to additional discovery to seek "certification" of a collective

consisting of job classifications <u>other than</u> Snow Sports Instructor, the Court finds such a request

premature.  As discussed above, the record does not contain plausible allegations that any

employees other than Snow Sports Instructors have suffered any FLSA violations.  Requests for

Vail policy statements and organizational charts from various locations in order to establish the

<u>scope</u> of FLSA violations is premature when the Plaintiffs have yet to assert colorable factual

allegations that any such FLSA violations even occurred.

Accordingly, this Court DENIES the Plaintiffs' Motion to Compel (D. 163).

### F.  Motion to Compel Interrogatory Responses

The Plaintiffs have served two sets of interrogatories upon Vail (D. 164-1, 164-3),

propounding a total of 42 interrogatories, but those interrogatories are studded with subparts,

amounting to more than separately-enumerated inquiries.  Vail objects to those interrogatories on

the grounds that the many of the subparts constitute discrete interrogatories and that,

cumulatively, the Plaintiffs' requests exceed the 75-interrogatory limit set by this Court.  D. 63 at

2.

The Court begins by summarily rejecting the Plaintiffs' argument that because

Scheduling Order did not expressly reference subparts when establishing the 75-interrogatory

limit, the Plaintiffs are therefore allowed to propound seemingly unlimited subparts.  Any

reasonable attorney familiar with federal practice would understand that a limit on interrogatories

applies equally to "discrete subparts" embedded within a single interrogatory, regardless of

whether a Scheduling Order states as much.  To suggest otherwise would render numerical limits

on interrogatories meaningless, as every conceivable question could otherwise be presented as a

discrete subpart beneath a single interrogatory.  Thus, the Court turns to the question of whether

the Plaintiffs' interrogatories, including any discrete subparts, exceed the 75-interrogatory limit

set by the Court.

Interrogatory subparts should be treated as a single inquiry if they are logically or

factually subsumed within and necessarily related to the primary question.  *Kendall v. GES*

*Exposition Servs.*, 174 F.R.D. 684, 685 (D. Nv. 1997*); see also Mullins v. Prudential Ins. Co. of*

*America*, 267 F.R.D. 504, 516 (W. D. Ky. 2010) ("Determining whether an interrogatory counts

as a separate question requires a pragmatic approach. Once a subpart of an interrogatory

introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of

the interrogatory that precedes it, the subpart must be considered a separate interrogatory no

matter how it is designated").  To illustrate the application of this analysis, the Court examines

Plaintiffs' Interrogatory #2, D. 164-1 at 5.  It reads, in its entirety:

> Interrogatory #2:  Did Vail Resorts of any of its subsidiaries, ski
> resorts, properties, or establishments pay hourly employees for the
> time spent working while traveling to/from employee or guest or
> other type of parking lot and locker rooms or work sites?
>
> a) If yes, identify each subsidiary, ski resort, property, or
> establishment that paid hourly employees for the time spent
> working while traveling to/from employee or guest or other
> type of parking lot and locker room or work sites.
>
> b) If yes, EXPLAIN how each subsidiary, ski resort, property,
> or establishment determined how much to pay each hourly
> employee for the time spent working while traveling.
>
> c) If yes, provide the data including the amount of time each
> hourly employee spent working while traveling and the hourly
> wage paid for the time spent working while traveling in native
> electronic format by individual for each day.
>
> d) If no, EXPLAIN why Vail Resorts or any of its subsidiaries,
> ski resorts, properties, or establishments DID NOT pay hourly
> employees for the time spent working while traveling to/from

employee or guest or other type of parking lot to locker rooms or work sites.

e) If only certain subsidiaries, ski resorts, properties, or establishments paid hourly employees for the time spent working while traveling from employee or guest or other type of parking lot to locker rooms or work sites, EXPLAIN why each subsidiary, ski resort, property, or establishment paid hourly employees for the time spent working while traveling from employee or guest or other type of parking lot to locker rooms or work sites.

f) If only certain subsidiaries, ski resorts, properties, or establishments DID NOT pay hourly employees for the time spent working while traveling from employee or guest or other type of parking lot to locker rooms or work sites, EXPLAIN why each subsidiary, ski resort, property, or establishment DID NOT pay hourly employees for the time spent working while traveling from employee or guest or other type of parking lot to locker rooms or work sites.

g) Are there document that support or contradict your answer to these interrogatories?

h) If there are documents that support or contradict your answer to these interrogatories, have the documents been produced?

i) If the documents have been produced, please IDENTIFY the documents.

j) If the documents have NOT been produced, EXPLAIN why the documents have NOT been produced and if they will be produced.

This Court agrees with Vail that this single interrogatory contains several discrete subparts, thereby counting as several inquiries against the 75-interrogatory limit. The main question is simply a "yes or no" inquiry as to whether employees were paid for travel time. Subpart (a) seeks to clarify any affirmative answer to the main question by asking Vail to identify those locations that yield a "yes" answer, and thus, subpart (a) is logically subsumed

within the main question.  (Put differently, the main question and subpart (a) could be joined into a single query that asked "which locations, if any, paid employees for travel time?")

Subpart (b) is an "explain how" question that is logically distinct from the yes-or-no main question.   The question of "does your watch work?" and "how does your watch work?" may address the same overall subject matter -- "your watch" -- but the facts they inquire into are entirely different and call upon entirely different categories of knowledge.  Asking Vail to identify <u>how</u> employees were paid for travel time constitutes an entirely distinct inquiry than one asking <u>whether</u> they were paid for such time.  Thus, subpart (b) is a distinct and new line of inquiry and constitutes a separate interrogatory.

Subpart (c) is a request that Vail produce documents.  Subparts requesting documents responsive to an interrogatory are routinely considered discrete from the main inquiry in the interrogatory.  *See Handy v. Fisher*, 2019 WL 6038065 at n. 14 (D.Colo. Nov. 14, 2019) ("A document request coupled with an interrogatory is considered a distinct subpart").  Thus, subpart (c) constitutes a third separate interrogatory.

Subparts (d), (e), and (f) are "explain why" inquiries.  For the same reasons as with subpart (b), an inquiry into "why" a certain fact exists is a logically discrete inquiry than an inquiry as to "whether" that fact exists, probing an entirely different body of knowledge, *e.g.* "does your watch work?" vs. "why does your watch work?".  Thus, subparts (d), (e), and (f) are, at the very least, a fourth separate interrogatory.

To avoid belaboring the analysis, it is sufficient to note that subpart (g)-(j) open up another entirely new line of inquiry, distinct from the main question of "does Vail pay employees for travel time?".  These subparts are both document-focused, rendering them presumptively discrete from the main question under cases like *Handy*, and are further focused on inquiring

about the discovery process itself rather than about employee travel time.  Thus, at a minimum, subparts (g)-(j) constitute at least a fifth separate interrogatory.

Examination of other interrogatories propounded by the Plaintiffs yield the same conclusion.  Interrogatory #3 is structurally identical to Interrogatory #2, with the same number and type of subparts, except that it relates to whether Vail paid employees for donning and doffing time.  For the reasons set forth above, Interrogatory #3 constitutes at least five separate inquiries.  Interrogatory #4 follows the same "yes or no" initial inquiry about the existence of a policy or practice, followed by several logically-discrete subparts asking Vail to explain the reasons for such a policy or practice, a request for a description of Vail's actual policy, and questions about the existence of documents that support or contradict Vail's answers to the interrogatory, comprising at least four separate inquiries.  Other interrogatories go even further.  Interrogatory #6 not only asks an initial "yes or no" question relating to Vail pay policies, followed by several subparts asking for explanations and records, but also includes subparts demanding that Vail "provide the evidence that supports your answer" and that it "compare the number of hours [ ] paid" to a different metric.  Ultimately, it is not a productive endeavor for the Court to review each interrogatory, one by one, and attempt to quantify how many discrete subparts it contains, such that the Court may declare that a specific interrogatory or subpart constitutes the 75th and final permissible inquiry.  It is enough to note that even a selective review of the Plaintiffs' interrogatories yields the conclusion that the aggregate number of unrelated subparts clearly exceeds the 75-interrogatory limit.

The question, then, is how the Court should address this issue.  The Plaintiffs argue that, by answering any of the interrogatories, Vail waived any numerosity objections, relying on cases like *Allahverdi v. Regens of the Univ. of N.M.*, 228 F.R.D. 696, 698 (D.N.M. 2005), that stand for

that proposition.  Not all courts adhere to an absolute approach that requires wholesale objections to all interrogatories, lest the responding party be deemed to waive all numerosity objections. *C.R. Baird, Inc. v. Smiths Medical ASD, Inc.*, 2020 WL 4050455 (D. Ut. July 20, 2020), catalogs a variety of alternative ways to addresses the situation where compound interrogatories operate to exceed numerical limitations imposed by the court.  Among those alternatives is the approach urged by Wright & Miller ("the better rule is to require the responding party to answer the ... interrogatories [in numerical order], and object to the remainder"), and concludes that selective answering constitutes a limited waiver of numerosity limits, but only as to "those interrogatories that were answered."  This Court agrees that harsh waiver rules like those of *Allahverdi* are inappropriate. To hold that a party believing that compound interrogatories caused the total number asked to exceed the court-imposed limit must avoid answering any interrogatories and must move for a protective order to avoid waiving any objections to numerical limits needlessly fosters additional litigation and delays the exchange of uncontested portions of discovery.  A rule that imposes considerable risks of waiver on the responding party might only encourage parties to deliberately propound complex interrogatories with the hope that the respondent would answer some of the simpler questions, thereby "waiving" objections to complex ones. The only risk to the proponent would be that they might eventually be required by the court to refine some questions.  This Court believes that the party propounding interrogatories must bear some burden to craft their queries carefully.  The alternatives identified in *C.R. Baird* reveal a more reasoned approach: that a responding party is obligated to answer the first X (whatever the court-set limit is) logically-discrete interrogatories, whether in main questions or in subparts.  Once that limit is reached, the respondent's duty to respond is suspended and the proponent of the requests must

move to compel further responses.  *See Paananen v. Cellco Partnership*, 2009 WL 3327227 (W.D.Wa. Oct. 8, 2009).

Accordingly, the Court GRANTS IN PART the Plaintiffs' Motion to Compel (D. 164). Vail shall answer the Plaintiffs' Interrogatories, beginning with Interrogatory #1, and respond to each inquiry and subpart until Vail believes that it has answered a total of 75 distinct inquiries, including any logically-discrete subparts (but not including subparts that are logically-related to the main inquiry).[15]  At that point, Vail's duty to respond is at an end and it is the Plaintiffs' obligation to move to compel any further responses they believe they are entitled to.  (Or perhaps, more appropriately, the parties could –and should -- confer and attempt to narrow the scope of the Plaintiffs' inquiries to a smaller set of interrogatories that Vail agrees to answer in full.)  Accordingly, the Plaintiffs' Motion to Compel Responses to Interrogatories (D. 164) is GRANTED IN PART AND DENIED IN PART.

## **CONCLUSION**

For the foregoing reasons, this Court:

1.  **Recommends** that the District Judge **BIFURCATE** the state-law claims (Claims 5-22) from the FLSA claims (Claims 1-4), and STAY all further proceedings regarding those state-law claims until the conclusion of proceedings relating to the FLSA claims;

2.  In the alternative, **Recommends** that the Plaintiffs' Motion for Class Certification (D. 149) be **DENIED**;

---

[15]     Vail shall indicate which subparts it considers to be logically-discrete inquiries constituting an additional interrogatory, thereby allowing both the Plaintiffs and, ultimately, the Court to determine the appropriateness of Vail's own tally.

3.  **Recommends** that the Plaintiffs' Motion to Disseminate Notice (D. 150) be **GRANTED IN PART**, insofar as this Court recommends that notice be approved and disseminated as to all Snow Sports Instructors employed by Vail nationwide, and **DENIED IN PART** in all other respects;

4.  **DENIES AS MOOT** Vail's Motion to Strike (D. 159);

5.  **DENIES** the Plaintiffs' Motion to Compel Production Of Documents (D. 163); and

6.  **GRANTS IN PART** and **DENIES IN PART** the Plaintiffs' Motion to Compel Responses to Interrogatories (D. 164).

Pursuant to 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72, Objections as to the conclusions in Parts I and II of this ruling must be filed within 14 days of service.  Failure to file timely Objections may result in the waiver of any further appellate review.

Dated at Grand Junction, Colorado this November 21, 2022**.**

_____
**Gordon P. Gallagher**
United States Magistrate Judge